UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JENNIFER R. WILSON-TRATTNER, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>ROBERT CAMPBELL Captain, )<br>individually and in his official capacity, )<br>SCOTT E. ROEGER Deputy, individually )<br>and in his official capacity, )<br>TED MUNDEN Lieutenant, individually )<br>and in his official capacity, )<br>MIKE SHEPHERD Sheriff, individually )<br>and in his official capacity, and )<br>BRAD BURKHART Major, individually and )<br>in his official capacity, )<br>)<br>Defendants. ) | No. 1:14-cv-01083-LJM-DML |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Defendant Robert Campbell ("Campbell"), Ted Munden ("Munden"), Sheriff Mike Shepherd ("Sheriff Shepherd") and Brad Burkhart ("Burkhart") (collectively, "Non-Roeger Defendants") have moved for summary judgment on all the claims against them brought by Plaintiff Jennifer R. Wilson-Trattner ("Wilson-Trattner"). Dkt. No. 76. Wilson-Trattner has alleged that Defendants, including Defendant Scott E. Roeger ("Roeger"), violated her due process right to an adequate investigation of Roeger's off-duty conduct and failed to prevent future adverse conduct that led to abuse. Wilson-Trattner also alleges that Roeger and other Defendants committed state torts against her.

The Non-Roeger Defendants argue that Wilson-Trattner cannot evidence material questions of fact on her "state-created danger" exception to the general rule that there is

no governmental duty to protect citizens from harm or constitutional deprivations caused by private citizens.  In addition, they argue that Wilson-Trattner cannot establish that the Sheriff's department failed to train its officers or had a customer or policy of deliberate indifference to her constitutionally protected rights.  Finally, the Non-Roeger Defendants assert that they are qualifiedly immune from Wilson-Trattner's claims because the law was not clearly established by Supreme Court or Seventh Circuit precedent that they owed her a duty.

For the reasons stated herein, the Court **GRANTS** the Non-Roeger Defendants' Motion for Summary Judgment.

Further, Roeger has moved for partial summary judgment on Wilson-Trattner's constitutional claims against him.  Dkt. No. 80.  Wilson-Trattner makes no arguments in opposition; therefore, Roeger's Motion to Partial Summary Judgment is **GRANTED**.

## I.  FACTS[1]

The facts, taken in the light most favorable to Wilson-Trattner, are these:

Wilson-Trattner began a relationship with Roeger, a merit deputy with Hancock County, in the summer of 2010. [W-T Dep. 73:17–77:10].  According to Wilson-Trattner, the relationship quickly became toxic and, when Roeger became abusive in 2012,[2] Wilson-Trattner began to reach out to the Hancock County Sheriff for help.

---

[1] These facts are taken from Wilson-Trattner's brief to provide the most favorable view possible, although there was some supplementation from the Non-Roeger Defendants' brief where necessary.

[2] Roeger has a documented history of similar abusive behavior (both physically and verbally) involving his ex-wife, Amanda.  This history includes striking Amanda with a lamp, lacerating her hand, and Amanda's subsequent statement that she "did not want her husband to get in trouble and that she just wanted him to leave the house." [GPD Offense Report 9/4/09, Dkt. 76-18, p. 6].  Though both then-Lt. Burkhart and then-Lt. Campbell were aware of this incident [Burkhart Decl. ¶6; Campbell Decl. ¶6], and even

## A. JUNE 17, 2012

Wilson-Trattner's first call for help came on June 17, 2012. After a night out with friends, Wilson-Trattner returned home to find that Roeger had come to her house and stolen the house key kept hidden outside of her door. [*Id.* at 98:6-100:12]. Roeger also had sabotaged the garage door opener, thereby effectively locking Wilson-Trattner out of her own home. [*Id.* at 102:15-103:9]. Wilson-Trattner called the police; the McCordsville Police Department ("MPD") as well as two members of the Hancock County Sheriff's department responded. [*Id.* at 103:10-19].

When Lt. Jeff Rasche ("Rasche") (of Hancock County) contacted Roeger to ask him to return the key, Roeger replied "F[**]k her . . . she or you guys can come get it." [Rasche Memo from 6/17/12, Dkt. 76-23, ¶2]. Wilson-Trattner also complained that Roeger had threatened and intimidated her, and she even showed Rasche a threatening text message from Roeger which read "You have f[**]ked with the wrong person." [*Id.* at ¶3]. Rasche first pretended that there was nothing inappropriate with the text messages Wilson-Trattner showed him; then, he chided Wilson-Trattner: "You know we can't help you; this is between you and him." [Plaintiff's Exh. 2, W-T Decl. ¶2].

---

though the GPD report repeatedly references Roeger's "anger problems" (including defendant Campbell being "aware of his temper, GPD Offense Report 9/4/09, p. 13), there is no record of any Hancock County Sheriff investigation at all into this incident; nor is this event referenced in Roeger's personnel file. [Plaintiff's Exh. 1].

Similarly, in April 2012, the Greenfield Police Department responded when Amanda complained of being "blocked in" by, "intimidated" by, and harassed with angry and profane text messages from Roeger. [GPD Offense Report 4/5/12, Dkt. 76-19, pp. 2-3]. Again, Campbell was aware of this incident and even spoke with Amanda about it. [Campbell Decl. ¶7]. And again, no reference to this incident appears anywhere in Roeger's personnel file. [Plaintiff's Exh. 1].

Although Rasche generated an internal memo about the incident, [Rasche Memo, Dkt. 76-23], and even though Rasche explained to Roeger that "his personal is not a department issue but when he takes action like he did last night and [Wilson-Trattner] calls [law enforcement] it becomes a department issue," no report was written, and no corrective action was taken. [*Id.* at p. 2]. No record of this memo, its findings, or its conclusions appears anywhere in Roeger's personnel file. [Plaintiff's Exh. 1]. Capt. Campbell also spoke to Roeger and told him he needed to stay away from Wilson-Trattner or keep the relationship under control. [Campbell Decl. ¶ 13]. There is no documentation of this conversation in Roger's personnel file either.

### B. JUNE 29, 2012

Twelve days later, on June 29, 2012, Roeger became physically violent with Wilson-Trattner. While preparing for an evening out at a promotional event, Roeger became furious that Wilson-Trattner had made plans on his night off and began cursing at her. [W-T Dep., 123:17-124:3]. Wilson-Trattner asked Roeger to leave her home. [*Id.*]. As Roeger walked out the door, he turned and grabbed Wilson-Trattner by the neck, choking her almost to the point of unconsciousness. [*Id.* at 124:5-125:2]. Then, Roeger smashed Wilson-Trattner's head against the wall. [*Id.*]. Wilson-Trattner called Deputy Walley ("Walley") with Hancock County who, in turn, contacted Sgt. Jarrod Bradbury ("Bradbury") of Hancock County. [*Id.*]. Yet by the time officers arrived, Wilson-Trattner had grown overwhelmed, scared, and intimidated. [*Id.* at 126:14-127:11]. No fewer than four officers stood over Wilson-Trattner as she lay in bed and explained to her that it could be *her* who went to jail because Roeger was accusing her of battery. [*Id.* at 129:1-8]. In fact, Roeger claimed that he had put his hands on Wilson-Trattner's neck to protect

4

himself. [MPD Report at 2]. As a result, Wilson-Trattner became intimidated, and she even told the officers that she was "scared to tell them what happened." [*Id.* at 129:15-20]. Without support from a counselor or other third-party, Wilson-Trattner simply asked the officers to have Roeger removed from her home and never told the officers her side of the story other than that she did not start hitting Roeger until he slammed her head against the wall. [*Id.* at 126:14-130:11; *see also* MPD Report at 3].

Detective Munden ("Munden") (a Detective/Sergeant for Hancock County) prepared a final report regarding the June 29, 2012, confrontation. [Munden Decl. ¶¶ 4, 17]. In that report, Munden concluded that Roeger had violated provisions of the Sheriff's rules and regulations. [*Id.* at ¶ 17]. Munden delivered the report and supporting evidence to Sheriff Mike Shepherd ("Sheriff Shepherd") on or before July 23, 2012. [*Id.*]. That report was "misfiled" in a filing cabinet and forgotten; it remained there for over a year; Sheriff Shepherd found it after Roeger was arrested in October, 2013. [Shepherd Decl. ¶¶ 25-26].

No further action (criminal or otherwise) was taken against Roeger; Roeger's personnel file contains no indication that the June 29, 2012 event (or the subsequent investigation) ever occurred, which Wilson-Trattner asserts is a direct violation of MRR 1.5.2. [Plaintiff's Exh. 1; Dkt. 76-2, p. 2, ¶ 7E (exempting only "informal notices/minor infractions" from inclusion in personnel file)].

Over the following weeks and months, Wilson-Trattner returned to the abusive relationship. [W-T Dep. 152:23-153:1].

## C.  JULY 8, 2013

Over a year later, on the evening of July 8, 2013, Roeger once again threatened Wilson-Trattner's life over an imagined incident of infidelity. [Handwritten Complaint dated 7/10/13, Dkt. 76-10, pp. 2-3].  When Roeger learned that Wilson-Trattner had traded text messages with another man, Roeger became enraged, discovered the man's phone number, and began texting him threatening messages. [*Id.*].  This culminated in Roeger sending the man nude pictures and sexually-explicit videos of Wilson-Trattner. [*Id.*].

Two days later, on July 10, 2013, Wilson-Trattner filed a formal complaint with the Hancock County Sheriff. [*Id.*].  Captain Campbell interviewed Wilson-Trattner and took photographs of Roeger's allegedly threatening and lewd text messages. [Campbell Decl. ¶28].  Although a year earlier Campbell had assured Wilson-Trattner that her June 29th confrontation with Roeger had become "a concern of the department" and that "an officer's conduct must be the same on and off duty" [*Id.* at ¶19], by July 10, 2013, Campbell's attitude had changed.  Specifically, during this interview, Campbell, in a derisive tone, explained to Wilson-Trattner that he did not see anything threatening about Roeger's text messages, that he was "sick of dealing with this shit," and that she "shouldn't call in [to the Hancock County Sheriff] for this personal shit."  [Plaintiff's Exh. 2, ¶3].

Although Campbell initiated an internal investigation into Roeger's actions, this investigative file too was "misplaced" in the trunk of a police car. [Campbell Decl. ¶¶44-45].  After consultation with a county prosecutor, Campbell and Rasche concluded that no criminal activity had occurred.  [*Id.* at ¶36].  However, Roeger was ordered to stop all contact with Wilson-Trattner and, later, he received a stern reprimand during which he

was told that his conduct was improper and he should stop all contact with Wilson-Trattner. [Dkt. No. 83 at 5-6]. Again, no further action was taken against Roeger; Roeger's personnel file contains no indication that the July 8, 2013 event, complaint, subsequent investigation, or reprimand ever occurred, which Wilson-Trattner asserts is another direct violation of MRR 1.5.2. [Plaintiff's Exh. 1; Dkt. 76-2, p. 2, ¶7E].

### D. SEPTEMBER 15, 2013

On September 15, 2013, Wilson-Trattner believes that Roeger manufactured an opportunity to retaliate against her. When she asked Roeger to return her house key, Roeger insisted that Wilson-Trattner come to his home to retrieve it. [W-T Dep. 175:4178:3]. When Wilson-Trattner arrived, the two argued and Wilson-Trattner left. [*Id.*]. Thereafter, Roeger contacted the Greenfield Police Department ("GPD") and claimed that Wilson-Trattner had assaulted him in the front yard of his home. [GPD Offense Report from 9/15/13; Dkt. 76-25, p. 4].

Three months later, on December 11, 2013, when contacted by the GPD, Wilson-Trattner provided the officers with a string of text messages from that day that indicated Roeger had lied about the alleged assault. [*Id.* at pp. 4-5]. The GPD supplemental report outlines the responding officer's finding that Roeger had instigated the conflict and subsequently had filed a false police report. [*Id.*]. The GPD forwarded the supplemental report (which included the finding that Roeger had attempted to file a false police report) to the Hancock County Prosecutor's Office for the purpose of filing criminal charges against Roeger. [*Id.*].

There is no evidence that anyone at the Hancock County Sheriff's office received a copy of the GPD reports on this incident; but Roeger had been told to document any incidents with Wilson-Trattner, which the report was intended to do. *Id.* at 4.

No action (criminal or otherwise) was taken against Roeger regarding this incident. *Id.* at 5-6. There is no record in Roeger's personnel file that the GPD had concluded that Roeger's report to it was false.

### E. OCTOBER 6, 2013

Wilson-Trattner claims that Roeger's abuse of Wilson-Trattner culminated in a felony home invasion, property damage, and battery on October 6, 2013. On that date, Wilson-Trattner invited a friend, Brian Shelly ("Shelly") to her home. [W-T Dep. 183:19-184:17]. Shortly thereafter, Wilson-Trattner discovered Roeger breaking into her house. [*Id.* at 184:16-186:20]. Wilson-Trattner confronted Roeger (who reeked of alcohol, spoke with slurred speech, and was barely able to stand, [Plaintiff's Exh. 2, ¶4]) in the laundry room and told him that he was not welcome in her home. Roeger pushed Wilson-Trattner out of the way, demanding to know if there was someone else in the house with her. [W-T Dep. 183:19-184:17]. Seeing Brian's boots by the front door, Roeger flew into a rage, smashing pictures off the walls, punching doors, and screaming. [*Id.*]. Roeger then grabbed Wilson-Trattner by her arm and threatened to make her life "a living hell." [*Id.*]. Shelly heard the commotion and called 911. [*Id.* at 187:13-20]. Roeger fled the scene.

Both the McCordsville Police Department and Hancock County Sheriff responded to the 911 call. At the scene, Deputy Gary Achor ("Achor") (of Hancock County) admonished Wilson-Trattner (even though she was not the one who called 911), telling

her: "We're sick of getting these calls from you;" and, "If you keep crying wolf, we're just going to stop responding." [Plaintiff's Exh. 2, ¶4].

Shortly following this incident, McCordsville Police arrested Roeger. [Campbell, Decl. ¶¶42-43]. Roeger was charged with and eventually pled guilty to various offenses stemming from his role in the multiple episodes of battery, strangulation, invasion of privacy, and residential entry occurring over the course of 2012 and 2013. [Plaintiff's Exhs. 3-6].[3]

## II. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part: "The court shall grant summary judgment if the movant shows that there is

---

[3] During his relationship with Wilson-Trattner, Roeger also was charged with felony Official Misconduct as well as Intimidation in Hamilton County when he used his employee access as a Hancock County merit deputy to obtain police records in an attempt to retaliate against Megan Navarro after their sexual relationship ended. [Plaintiff's Exhs. 7 & 8].
  Roeger resigned his post with the Hancock County Sheriff's Department in January 2014 following notice from Sheriff Shepherd of "Written Charges to Discharge" and his intent to terminate Roeger's employment following a hearing before the Merit Board. [Plaintiff's Exh. 1, pp. 24-30]. Even the "Written Charges to Discharge" contained in Roeger's personnel file, which purportedly detail the reasons for Roeger's discharge, omit the "attached Exhibit A … for the particular facts supporting this charge." [*Id.* at pp. 25-28]. In other words, even now Roeger's personnel file contains no information whatsoever about this incident, his arrest, or any of the reasons for Sheriff Shepherd's decision to terminate him.

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed. Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Goodman v. Nat'l Sec. Agency, Inc.*. 621 F.3d 651, 654 (7th Cir. 2010). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence. *See Goodman*, 621 F.3d at 654; *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary

judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the Court to the lack of evidence as to an element of that claim. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

### III. DISCUSSION

#### A. INDIVIDUAL LIABILITY

Wilson-Trattner contends that the Defendants violated her substantive due process right to be free from a state-created danger. She claims that, when faced with a series of escalating incidents by someone with a known history of domestic violence, the Defendants did nothing to curb Roeger's behavior. Dkt. No. 83 at 12-17. Wilson-Trattner argues that the lack of negative write-ups in Roeger's file and the convenient misplacement of any such write-ups evidence that the Defendants "conveyed to Roeger the clear and unmistakable message that he could continue to engage in this behavior with impunity." *Id.* at 15. Wilson-Trattner states that she became even more vulnerable based on the Defendant's failure to act; therefore, they affirmatively increased the danger to her. *Id.* at 15-16. Further, Wilson-Trattner distinguishes the Defendants cases, *Doe v. Village of Arlington Heights*, 782 F.3d 911 (7th Cir. 2015), and *Windle v. City of Marion*, 321 F.3d 658 (7th Cir. 2003), alleging that the officers in those case did not have any history with the victim or the alleged perpetrators from which to infer an implied assurance

of inaction. *Id.* at 16-17. In addition, Wilson-Trattner claims that Defendants' deliberate indifference to domestic violence would "shock the conscience" of any reasonable jury. *Id.* at 20-22. Wilson-Trattner also questions the Defendants' qualified immunity defense based on the Second Circuit's opinion in *Okin v. Villlage of Cornwall-on-Hudson Police Department*, 577 F.3d 415 (2d Cir. 2009). *Id.* at 23-24. Finally, Wilson-Trattner contends that the Hancock County Sheriff's failure to train his employees in handling domestic violence incidents and his failure to have a protocol for handling cases of alleged domestic abuse by a deputy proximately caused her damages. *Id.* at 24-27.

The Defendants assert that the circumstances of this case are far different from those in *Okin*, in which the Second Circuit allowed implicit encouragement of domestic violence to go to trial; and far beyond any holding of the Seventh Circuit, which, to date, has not endorsed a theory of implicit assurance. Dkt. No. 88 at 5-10. Even if this Court were to endorse and adopt *Okin*, the Defendants contend that the Defendants actions made it clear to Roeger that his off-duty conduct was unacceptable; there is no evidence of implicit encouragement. *Id.* at 10-12. Further, the Defendants argue that Seventh Circuit precedent requires that a state actor's creation of a danger be the "cause in fact" of the victim's injuries, which Wilson-Trattner cannot show because of the significant amount of time between incidents. *Id.* at 12-13. In addition, the Defendants state that a reasonable jury could not conclude that their conduct was so rare and egregious to be considered deliberately indifferent. *Id.* at 14-15.

Under the Supreme Court's decision in *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989), "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular

individuals." *Id.* at 198. Many Circuit Courts of Appeals, including the Seventh Circuit, have recognized that one such limited circumstance is when, by his affirmative acts, a state actor creates or increases a danger to an individual. *See Sandage v. Bd. of Com'rs of Vanderburgh Cnty.*, 548 F.3d 595, 599 (7th Cir. 2008). However, "create or increase" may not be interpreted so broadly to include a failure to protect. *Id.* (discussing *DeShaney*). Stated another way, "it violates the due process clause for a government employee acting within the course of his employment to commit a reckless act that by gratuitously endangering a person results in an injury to that person." *Slade v. Bd. of Sch. Dirs. of Milwaukee*, 702 F.3d 1027, 1033 (7th Cir. 2012).

Based on the precedents cited above, the Court concludes that the Seventh Circuit is unlikely to adopt an implicit conduct standard such as that set forth in *Okin* and, even if it did, the circumstances in this case are distinguishable. In *Okin*, a domestic violence victim alleged over 10 instances of physical abuse and/or stalking by her boyfriend over an eighteen month period. 577 F.3d at 419-26. In response to the first reported incident, officers at the scene did not believe the victims' story and were heard talking about football with the boyfriend. *Id.* at 420-21. Evidence showed that the boyfriend owned a bar frequented by the defendant police chief as well as several defendant police officers. *Id.* at 420. The boyfriend bragged to the victim that he could get away with anything in that town and that he had admitted to the defendant police chief "that he could not 'help it sometimes when he smacks [the victim] around'," *id.* (citation omitted by the *Okin* court), and that the victim was a terrible mother. *Id.* For the remaining incidents, the defendant and non-defendant officers rarely documented them as domestic violence disputes, or even interviewed the boyfriend, *id.* at 421-26; and at least one responding officer admitted

that he had no training to handle domestic violence disputes. *Id.* at 423. At least one responding officer accused the victim of forum shopping to attain help prosecuting her complaints. *Id.* at 425.

In light of these facts, the *Okin* Court decided that a material question of fact existed as to whether the defendants "implicitly but affirmative encouraged [the boyfriend's] domestic violence. *Id.* at 429-30. The Second Circuit reasoned that the football conversation, the failure of the police chief to arrest the boyfriend upon learning that he would hit the victim, the multiple failures by officers to file a domestic incident report, interview the boyfriend or make an arrest "plainly transmitted the message that what [the boyfriend] did was permissible and would not cause him problems with the authorities." *Id.* at 430. The Second Circuit concluded, "A reasonable view of the evidence supports the inference that defendants' actions rise to the level of affirmative conduct that created or increased the risk of violence to the victim." *Id.* (citing *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir. 2005); *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993), *overruled on other grds. by Leatherman v. Tarrant Cnty. Narcotics Intell. & Coor. Unit*, 507 U.S. 163, 164 (1993)). The *Okin* court also found material questions of fact on the qualified immunity issue, *id.* at 437, as well as the municipal liability issue. *Id.* at 441.

But, in *Sandage* the Seventh Circuit made it clear that for the state-created-danger exception to apply, the state actor must do something to turn a potential danger into an actual one and distinguished cases like *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998) (applying the exception where, after promising not to do so, police gave an audio tape of an informant to a suspect, who later killed the informant); from cases like *Windle v. City*

*of Marion*, 321 F.3d 68 (7th Cir. 2003) (declining to hold a police officer liable for failing to intervene to protect a student from sexual abuse when he had intercepted phone calls between the student and teacher for two months). This case is more like *Windle* because Wilson-Trattner claims that Defendants refused to arrest Roeger or issue a written reprimand after incidents of domestic abuse that occurred in 2012, which emboldened him to commit a more serious battery over a year later because he had no reason to believe Defendants would do anything to stop him. But, Wilson-Trattner has no evidence that Defendants affirmatively approved or condoned any of Roeger's conduct or said something to Roeger that encouraged him to act out against Wilson-Trattner. After each known incident, Roeger's superiors told Roeger his behavior was inappropriate and that it should stop. Further, there is no evidence that the officers failed to treat the incidents as domestic violence problems or failed to file a report. The worst facts are that Sheriff Shepherd and Capt. Campbell misplaced the reports on Roeger's conduct; at most this was negligent. The Seventh Circuit has refused to equate even grossly negligent behavior with the recklessness required by 42 U.S.C. § 1983. *See Slade*, 702 F.3d at 1032 (distinguishing negligence from the basis for liability in a due process case).

There is no evidence that Roeger was in uniform during any of the incidents; therefore, he cannot be held liable under § 1983.

For these reasons, summary judgment in favor of Defendants on Wilson-Trattner's § 1983 claim is appropriate.

### B. QUALIFIED IMMUNITY

Even if there was enough evidence to create a material question of fact as to the violation of Wilson-Trattner's substantive due process rights, under Seventh Circuit and

Supreme Court precedent, the right is not clearly established. There is no factually analogous case in the Seventh Circuit that has held that officers have a duty to protect a domestic violence victim from abuse over a year after the last known incident of violence. Further, as discussed above, it is doubtful that the Seventh Circuit would adopt the Second Circuit's implicit conduct standard unless the circumstances were egregious, which is not the case here. Therefore, the Defendants are entitled to qualified immunity on Wilson-Trattner's due process claim.

### C.  MUNICIPAL LIABILITY

With respect to municipal liability, Wilson-Trattner argues that Sheriff Shepherd failed to train his employees and failed to implement protocols for handling officers accused of domestic abuse. She cites as evidence the lack of training by the Sheriff on domestic violence encounters. Dkt. No. 32 at 25-56. In addition, she contends that the Sheriff failed to implement any policy for "fitness of duty" evaluations for troubled employees. *Id.* at 25-56. She reasons that because there was a total failure to train or implement policies for handling employees accused of domestic violence, Sheriff Shepherd was deliberately indifferent to Wilson-Trattner's right to be protected from a domestic abuser who worked for his office.

Defendants contend that, contrary to Wilson-Trattner's assertion otherwise, each law enforcement officer is required to complete a minimum of 480 hours of basic training, which includes training to handle domestic disputes. Dkt. No. 88 at 19. Further, there is no evidence that the Sheriff must have a "fitness of duty" policy; only that other cities have adopted such policies.

Under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and its progeny, to succeed on her claim for municipal liability, Wilson-Trattner must show that a municipal policy caused the deprivation of a constitutional right. *Id.* at 691. Lack of training or the lack of a policy may suffice, but Wilson-Trattner must evidence that it was a deliberate choice by Sheriff Shepherd to disregard a known or obvious consequence. *See Connick v. Thompson*, 563 U.S. 51, 61-62 (2011) (citations omitted). Here, the Court has concluded that there was no constitutional violation. Even if the conclusion were otherwise, Wilson-Trattner cannot show that Sheriff Shepherd was deliberately indifferent to the need to have a policy regarding discipline for employees who committed misconduct. Roeger was verbally reprimanded and/or counseled after each incident that came to the attention of the Sheriff's office. Moreover, in addition to incident reports, at least one if not two written investigative reports were generated. Yes, the latter reports were misplaced; however, there is no evidence that these types of reports were consistently or systematically mishandled, which is required for municipal liability under *Connick*. *See id.* at 62.

### D. STATE LAW CLAIMS

With respect to Wilson-Trattner's state law claims for battery and intentional infliction of emotional distress, Roeger does not seek summary judgment on these claims, but requests dismissal without prejudice so that Wilson-Trattner may bring them in state court; the Non-Roeger Defendants seek dismissal of all of those claims as a matter of state tort law as well as on the merits. Wilson-Trattner argues only that her intentional infliction of emotional distress claim against the Sheriff in his official capacity should not be dismissed. Dkt. No. 83 at 28-30. Specifically, Wilson-Trattner claims that a jury should

decide whether or not it is extreme and outrageous conduct for the Sheriff's employees to fail to take action in light of the consistent pattern of domestic abuse inflicted upon her by Roeger. This is particularly true here, she claims, where misconduct reports were misplaced twice. However, the Court has already considered this evidence in the context of Wilson-Trattner's § 1983 claim where the standard is reckless and found it wanting. The Court is hard pressed to consider the same conduct "extreme and outrageous" in light of that finding. Therefore, summary judgment in favor of the Non-Roeger Defendants is also warranted on these claims.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the Court **GRANTS** summary judgment in favor of Defendants Robert Campbell, Ted Munden, Sheriff Michael Shepherd, and Brad Burkhart on all of Plaintiff Jennifer R. Wilson-Trattner's claims against them in any capacity; **GRANTS** summary judgment in favor of Defendant Scott E. Roeger on Plaintiff Jennifer R. Wilson-Trattner's claim pursuant to 42 U.S.C. § 1983; and **DENIES** summary judgment on Plaintiff Jennifer R. Wilson Trattner's battery and intentional infliction of emotional distress claims against Defendant Scott E. Roeger, to the extent such was sought.

Defendants Campbell, Munden, Shepherd and Burkhart have requested that judgment be entered on the claims against them if the Court were to rule in their favor. The Court sees no just reason for delay and partial judgment shall be entered accordingly.

The Court hereby sets this matter for a **Telephonic Status Conference with the remaining parties for Wednesday, June 1, 2016, at 10:30 a.m. EDT**, at which time the remaining parties (Jennifer R. Wilson-Trattner and Scott E. Roeger) shall appear by

counsel to discuss resolution of the remaining claims by calling the Court's Conference Bridge, **317-229-3960**.

IT IS SO ORDERED this 18th day of May, 2016.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jeremy Michael Dilts
CARSON BOXBERGER
dilts@carsonboxberger.com

Neal Frederick Eggeson, Jr.
EGGESON APPELLATE SERVICES
nfelaw@gmail.com

Wayne E. Uhl
STEPHENSON MOROW & SEMLER
wuhl@stephlaw.com

Matthew B. Keyes
THE KEYES LAW GROUP LLC
matthew.keyes@keyeslawgroupllc.com